IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 16, 1999 Session

## DAN B. WILSON, JR. v. LAWRENCE H. RUBIN, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 96-3715-I     Irvin H. Kilcrease, Jr., Chancellor**

---

**No. M1998-00959-COA-R3-CV - Filed November 6, 2002**

---

This appeal involves the termination of an employee by a music publishing company after one of its songwriters complained that the employee had stalked and harassed her. The employee filed suit in the Chancery Court for Davidson County alleging gender and age discrimination in violation of the Tennessee Human Rights Act. The publishing company moved for a summary judgment asserting that it had a valid non-discriminatory ground for terminating the employee. The employee responded that the proffered non-discriminatory ground was pretextual. The trial court granted the summary judgment and dismissed the employee's complaint. On this appeal, the employee asserts that genuine material factual disputes regarding the publishing company's non-discriminatory reasons for terminating him should have prevented the trial court from granting the summary judgment. We agree and, therefore, vacate the order dismissing the employee's complaint.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM B. CAIN, J., joined.

W. Gary Blackburn, Nashville, Tennessee, for the appellant, Dan B. Wilson, Jr.

Gail Vaughn Ashworth, Nashville, Tennessee, for the appellees, Lawrence H. Rubin and Sony/ATV Music Publishing Company, LLC.

**OPINION**

**I.**

Dan B. Wilson, Jr. has worked as a "song plugger" in Nashville ever since 1972. He joined Sony/ATV Music Publishing Company, LLC's ("Sony/ATV") legendary predecessor, Tree Publishing, in 1976. His duties included working with new songwriters and artists to develop their material, helping them record demo tapes and prepare publicity portfolios, and pitching their material to other artists and record producers. By all accounts, Mr. Wilson was a very successful and effective song plugger. He was reputedly one of the highest paid song pluggers in Nashville, earning $106,000 per year in salary and bonuses.

Mr. Wilson was one of five song pluggers working in Nashville for Sony/ATV in 1995. Even though he was one of two persons in Sony/ATV's Nashville office with the title "Vice President for Creative Services," his duties remained essentially the same as they had always been. All five of Sony/ATV's song pluggers were male because Sony/ATV's only female song plugger had recently taken a job with a record label and had been replaced by a male. Donna Hilley, Sony/ATV's president and chief executive officer, made clear her desire to employ another female song plugger but had not made clear whether she intended to create a new position or to wait until one of the existing song plugger positions became vacant.

In April 1995, Chrissy Gabell, a strikingly beautiful 25-year-old woman from Arizona, arrived in Nashville to "chase that neon rainbow."[1] Her father had arranged an introduction for her with the late David Skepner, the president of a prominent entertainment management company and adjunct professor in the music business program at Belmont University. Mr. Skepner, acting as Ms. Gabell's "guidance counselor," referred her to Ms. Hilley, and Ms. Hilley, in turn, asked Mr. Wilson to evaluate Ms. Gabell's potential as a songwriter or performing artist.

After listening to Ms. Gabell's material, Mr. Wilson thought he "heard a sparkle of something" and decided that "[t]here was some talent there."[2] Mr. Wilson told Ms. Gabell that he would begin looking for suitable material for her and that he would assist her in recording a demo tape. Later in the year, Ms. Hilley inquired into Ms. Gabell's progress after receiving another telephone call from Mr. Skepner. In late summer 1995, Mr. Wilson helped Ms. Gabell record a demo tape using pre-recorded music tracks and told her that he would begin working on a live recording session for her.

When Mr. Wilson first met Ms. Gabell, he was a middle-aged father of two adult children who had been divorced for twelve years. By November 1995, he came to believe that Ms. Gabell was physically attracted to him "for some reason." During lunch on November 14, 1995, Mr. Wilson and Ms. Gabell decided to move beyond their professional relationship to a much more intimate one. They began dating, and their relationship was not only common knowledge at Sony/ATV but was also the subject of discussion among other Sony/ATV employees, including Ms. Hilley.

Mr. Wilson traveled to Arizona during the holidays to visit Ms. Gabell and her family. On their flight back to Nashville, Ms. Gabell revealed that she was sharing her apartment with Mark Tims. Up to this point, she had led Mr. Wilson to believe that her roommate was female. Upon their return from Arizona, Ms. Gabell moved into the apartment Mr. Wilson shared with one of his adult daughters. In early 1996, Ms. Gabell accompanied Mr. Wilson on a trip to Europe for a country music convention and shared a hotel room with him. Following the trip, Ms. Gabell told Mr. Wilson that she had decided to move back into her apartment. When Mr. Wilson asked her to move back in with him, Ms. Gabell responded that "she didn't feel like she wanted to do that right at that point." Mr. Wilson, trying to be a "man of the nineties," did not press the issue.

---

[1] Alan Jackson, *Chasin' That Neon Rainbow*, in *Here in the Real World* (Arista Records 1989) (CD Recording).

[2] Because this is an appeal from a summary judgment, we are relying on the presently undisputed facts offered by Mr. Wilson regarding his relationship with Ms. Gabell.

Although Mr. Wilson and Ms. Gabell were beginning to experience some ups and downs, they continued their intimate relationship into the spring. Mr. Wilson helped Ms. Gabell complete another demo tape in February 1996. He had already used his own money to pay for Ms. Gabell's breast augmentation surgery prior to their trip to Europe, and his generosity toward her continued. He paid for a number of her recording sessions and for her publicity portfolio. He also bought Ms. Gabell clothes and gave her $3,000 for a down payment on a car. Finally, in April 1996, Mr. Wilson obtained Ms. Hilley's agreement to sign Ms. Gabell to a one-year contract with Sony/ATV as a songwriter. As he said later, "[t]his woman could have had anything she wanted from me if she had just played fair and honest."

Mr. Wilson's "big blowup" with Ms. Gabell occurred during the summer of 1996 when he discovered that she had made over $5,000 in purchases on two of his personal credit cards without telling him. He left a message on her answering machine to the effect that "[i]f you don't get these credit cards straightened out, you are going to have to figure out some other way to get around because I'm coming to get my car,[3] and I'll get them straightened out." Ms. Gabell promised to return the credit cards in two days. When she did not, Mr. Wilson decided to stop by her apartment on the way to work to retrieve them and left a message on her answering machine that he was coming to pick up the cards. Mr. Wilson was able to enter Ms. Gabell's gated apartment complex by following another car through the gate. He left a short time later after he discovered that Ms. Gabell was not home.

Approximately two weeks later, on August 13, 1996, Ms. Hilley called Mr. Wilson into her office. There, in the presence of Don Cook, a Sony/ATV senior vice president, and Chris Waters Dunn, a Sony ATV/vice president, Ms. Hilley informed Mr. Wilson that Ms. Gabell had complained that he had threatened to kill her and that he had broken into her apartment complex. Ms. Hilley also recounted that Ms. Gabell had denied having consensual sexual relations with Mr. Wilson and had claimed that Mr. Wilson was stalking her, making unwanted sexual advances toward her, and threatening to ruin her career if she did not agree to continue dating him.

Mr. Wilson was surprised by Ms. Gabell's allegations and denied that his conduct with Ms. Gabell had been inappropriate or unwelcomed. He recounted the details of his relationship with Ms. Gabell for Ms. Hilley and Messrs. Cook and Dunn and was surprised to discover that they did not appear to believe him. Finally, to conclude the meeting, Ms. Hilley told Mr. Wilson that he would be allowed to resign with a severance package from Sony/ATV but that he would be fired if he declined the offer.

Over the course of the next several days, Mr. Wilson provided Ms. Hilley with corroboration of his version of his relationship with Ms. Gabell, including her love notes and entries on her personal calendar where she had drawn hearts on the days commemorating the monthly anniversary of their first romantic encounter in November 1995. None of this information seemed to sway Ms. Hilley, and Mr. Wilson eventually declined to accept the severance package by telling Sony/ATV

---

[3]The automobile Ms. Gabell had purchased using Mr. Wilson's $3,000 as her down payment.

that they could "take their money and . . . give it to the poor boys' home." Shortly thereafter, Mr. Cook ordered Mr. Wilson to pack up his personal belongings and to leave the premises permanently.

After Mr. Wilson's departure, Sony/ATV promoted Amy McKeehan, the 31-year-old administrative assistant to the song pluggers, to take his place.[4] Sony/ATV declined to renew Ms. Gabell's contract when it expired, and she returned to Arizona without making any further noise on Sixteenth Avenue.[5]

In November 1996, Mr. Wilson filed suit in the Chancery Court for Davidson County, alleging that Sony/ATV had engaged in age and gender discrimination in violation of the Tennessee Human Rights Act by firing him and replacing him with a younger employee. Sony/ATV denied the allegation and, following discovery by both sides, moved for a summary judgment on the ground that it had a legitimate, non-discriminatory reason for firing Mr. Wilson. Mr. Wilson responded to the motion by asserting that Sony/ATV's proffered reasons for firing him were pretextual. He supported his response with the detailed affidavit of Ms. McKeehan who by this time had also been fired by Sony/ATV. The trial court granted Sony/ATV's motion for summary judgment, and Mr. Wilson has appealed to this court.

## II.
### THE STANDARD OF REVIEW

Granting a summary judgment is warranted in virtually any civil case where the moving party demonstrates that no genuine issues of material fact exist and that it is entitled to a judgment as a matter of law. *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001); *Armoneit v. Elliott Crane Serv.*, 65 S.W.3d 623, 627 (Tenn. Ct. App. 2001). Because a summary judgment involves an issue of law rather than an issue of fact, *Planters Gin Co. v. Federal Compress & Warehouse Co.*, 78 S.W.3d 885, 889 (Tenn. 2002), an order granting a summary judgment is not entitled to a presumption of correctness on appeal. *Guy v. Mutual of Omaha Ins. Co.*, 79 S.W.3d 528, 534 (Tenn. 2002).

Appellate courts do not employ the standard of review in Tenn. R. App. P. 13(d) when reviewing an order granting a summary judgment. *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997); *Estate of Kirk v. Lowe*, 70 S.W.3d 77, 79-80 (Tenn. Ct. App. 2001). Rather, we determine for ourselves whether the moving party has satisfied the requirements of Tenn. R. Civ. P. 56. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997); *Cantrell v. DeKalb County*, 78 S.W.3d 902, 905 (Tenn. Ct. App. 2001). In this process, we must consider the evidence in the light most favorable to the nonmoving party and resolve all inferences in the nonmoving party's favor. *Johnson v. LeBonheur Children's Med. Ctr.*, 74 S.W.3d 338, 342 (Tenn. 2002); *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn. 2001).

---

[4] As it turned out, Ms. McKeehan's tenure at Sony/ATV was short-lived. In May 1998, Ms. McKeehan filed a complaint with the EEOC alleging a hostile work environment at Sony/ATV due to sexual harassment by fellow employees and superiors. Sony/ATV fired Ms. McKeehan approximately two weeks after she filed the complaint.

[5] Lacy J. Dalton, *16th Avenue*, in *16th Avenue* (Columbia Records 1982) (33 rpm LP recording).

Litigants may use a motion for summary judgment to challenge their adversaries to put up or shut up on a critical issue in a case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989). A moving party will be entitled to a summary judgment if it can demonstrate that the non-moving party will be unable to prove an essential element of its case on which it will bear the burden of proof at trial. *Byrd v. Hall*, 847 S.W.2d 208, 213 (Tenn. 1993); *Solomon v. FloWarr Mgt., Inc.*, 777 S.W.2d 701, 706 (Tenn. Ct. App. 1989). Customarily, defendants employ this strategy either to negate an essential element of the plaintiff's claim or to establish an affirmative defense to the plaintiff's claim. *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 88 (Tenn. 2000); *Pendleton v. Mills*, 73 S.W.3d 115, 121 (Tenn. Ct. App. 2001).

Once a party seeking a summary judgment demonstrates that its motion complies with the requirements of Tenn. R. Civ. P. 56, the burden of going forward shifts to the non-moving party to demonstrate either that material factual disputes exist or that the moving party is otherwise not entitled to a judgment as a matter of law. *Nelson v. Martin*, 958 S.W.2d 643, 647 (Tenn. 1997); *Cantrell v. DeKalb County*, 78 S.W.3d at 905. Mere conclusory allegations will not suffice to create a material factual dispute. *Psillas v. Home Depot, U.S.A., Inc.*, 66 S.W.3d 860, 864 (Tenn. Ct. App. 2001). Non-moving parties may deflect a summary judgment motion challenging their ability to prove an essential element of their case by (1) pointing to evidence either overlooked or ignored by the moving party that creates a factual dispute, (2) rehabilitating evidence challenged by the moving party, (3) producing additional evidence that creates a material factual dispute, or (4) submitting an affidavit in accordance with Tenn. R. Civ. P. 56.07 requesting additional time for discovery. *McCarley v. West Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998); *Davis v. Campbell*, 48 S.W.3d 741, 747-48 (Tenn. Ct. App. 2001). A non-moving party who fails to carry its burden faces summary dismissal of the challenged claim or defense because, as our courts have repeatedly observed, the failure of proof concerning an essential element of a case renders all other facts immaterial. *Alexander v. Memphis Individual Practice Ass'n*, 870 S.W.2d 278, 280 (Tenn. 1993); *Strauss v. Wyatt, Tarrant, Combs, Gilbert & Milom*, 911 S.W.2d 727, 729 (Tenn. Ct. App. 1995).

A summary judgment is not appropriate when a case's determinative facts are in dispute. Thus, courts reviewing an order granting a summary judgment must determine whether factual disputes exist and whether these disputes are material to the claim or defense implicated by the summary judgment motion. *Byrd v. Hall*, 847 S.W.2d at 214; *Cantrell v. DeKalb County*, 78 S.W.3d at 905-06. For a question of fact to exist, reasonable minds must be able to differ over whether some alleged occurrence or event did or did not happen or whether a particular condition did or did not exist. *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995); *Davis v. Campbell*, 48 S.W.3d at 747. If reasonable minds could justifiably reach different conclusions based on the evidence at hand, then a genuine question of fact exists. *Louis Dreyfus Corp. v. Austin Co.*, 868 S.W.2d 649, 655 (Tenn. Ct. App. 1993). If, on the other hand, the evidence and the inferences to be reasonably drawn from the evidence would permit a reasonable person to reach only one conclusion, then there are no material factual disputes and the question can be disposed of as a matter of law. *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d at 269; *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 66 (Tenn. 2001); *Seavers v. Methodist Med. Ctr.*, 9 S.W.3d 86, 91 (Tenn. 1999).

Not all factual disputes warrant denying a motion for summary judgment. Many factual disputes have no bearing to the ultimate outcome of the parties' dispute. Thus, factual disputes warrant denying a motion for summary judgment only when they are material. Tenn. R. Civ. P. 56.04 (requiring the moving party to demonstrate "that there is no genuine issue as to any material fact"). A factual dispute is material for the purposes of Tenn. R. Civ. P. 56 if it must be decided in order to resolve the substance of the claim or defense being tested by the summary judgment motion. *Luther v. Compton*, 5 S.W.3d 635, 639 (Tenn. 1999); *Byrd v. Hall*, 847 S.W.2d at 215; *Chambers v. City of Chattanooga*, 71 S.W.3d 281, 284 (Tenn. Ct. App. 2001).

## III.
### GENDER AND AGE DISCRIMINATION CLAIMS UNDER THE TENNESSEE HUMAN RIGHTS ACT

The Tennessee Human Rights Act is a comprehensive anti-discrimination law, *Phillips v. Interstate Hotels Corp.*, 974 S.W.2d 680, 683 (Tenn. 1998), intended to further the policies embodied in the similar federal laws against employment discrimination. Tenn. Code Ann. § 4-21-101(a)(1) (1998); *Frazier v. Heritage Fed. Bank for Savs.*, 955 S.W.2d 633, 636 n. 1 (Tenn. Ct. App. 1997). The Act proscribes discriminatory employment practices with respect to the compensation, terms, conditions, or privileges of employment based on considerations of race, creed, color, religion, sex, age, or national origin. Tenn. Code Ann. § 4-21-101(a)(3). In light of the intended overlap in purpose between the Tennessee Human Rights Act and federal anti-discrimination laws, Tennessee's courts regularly consult the decisions of their federal counterparts for guidance when called upon to construe and apply the Tennessee Human Rights Act. *Weber v. Moses*, 938 S.W.2d 387, 390 (Tenn. 1996); *Frazier v. Heritage Fed. Bank for Savs.*, 955 S.W.2d at 636 n.1.[6]

## A.
### Methods For Proving Employment Discrimination Claims

The burden of proving the ultimate issue of unlawful employment discrimination always rests with the employee. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093 (1981); *Spann v. Abraham*, 36 S.W.3d at 464. Whether the claim involves discrimination based on gender or age, the framework for allocating the burden of production and the order of the presentation of proof is the same. Employees pursuing an employment discrimination claim under the Tennessee Human Rights Act may carry their burden of proof by employing either the direct or the indirect method of proof. *Moore v. Nashville Elec. Power Bd.*, 72 S.W.3d 643, 651 (Tenn. Ct. App. 2001); *Perlberg v. Brencor Asset Mgt., Inc.*, 63 S.W.3d 390, 394-95 (Tenn. Ct. App. 2001).

In the context of an employment discrimination case, the direct method of proof focuses on the motivation of the employer responsible for the contested decision. *Walker v. Glickman*, 241 F.3d 884, 888 (7th Cir. 2001). Direct evidence of discrimination consists of evidence of an employer's

---

[6]These federal precedents are, of course, not binding on Tennessee courts and do not limit our ability to give the fullest possible effect to the Tennessee Human Rights Act. *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 705 (Tenn. 2000); *Parker v. Warren County Util. Dist.*, 2 S.W.3d 170, 173 (Tenn. 1999); *Spann v. Abraham*, 36 S.W.3d 452, 463 (Tenn. Ct. App. 1999).

conduct or statements[7] which, if believed, requires a conclusion that unlawful discrimination was a substantial motivating factor for the employer's actions. *Clearwater v. Independent Sch. Dist. No. 166*, 231 F.3d 1122, 1126 (8th Cir. 2000); *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999); *Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993). Evidence that can be interpreted as an acknowledgment of discriminatory intent will suffice as direct evidence even if it stops short of a virtual admission of illegality. *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001); *Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999).

Persons relying on the direct method of proof may use both direct and circumstantial evidence to support their claim. *Goodman v. Pennsylvania Turnpike Comm'n*, 293 F.3d 655, 664 (3d Cir. 2002); *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1168-69 (7th Cir. 1998); *Spann v. Abraham*, 36 S.W.3d at 464. The evidence must satisfy two conditions to be probative. First, it must relate to conduct or statements by persons directly involved in the decision-making process. *Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1017 (8th Cir. 1999). Statements by persons who are not part of the decision-making process will not suffice. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000). Second, the conduct or statements must relate to the particular employment decision being challenged. *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 550 (10th Cir. 1999); *Thomas v. National Football League Players Ass'n*, 131 F.3d 198, 204 (D.C. Cir. 1997). Stray remarks in the workplace, statements made long before the contested employment action, and statements otherwise unrelated to the action at issue will not suffice. *Markel v. Board of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 910 (7th Cir. 2002); *Smith v. Leggett Wire Co.*, 220 F.3d at 760; *Fast v. Southern Union Co.*, 149 F.3d 885, 890 (8th Cir. 1998).

Direct evidence of intentional employment discrimination is often hard to come by. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 271, 109 S. Ct. 1775, 1802 (1989) (O.Connor, J., concurring); *Moore v. Nashville Elec. Power Bd.*, 72 S.W.3d at 651. Accordingly, employees who cannot prove unlawful discrimination using the direct method resort to the indirect method of proof. This method employs the familiar framework for allocating the burden of production and the order of presentation of proof[8] set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). The goal of this approach is to progressively sharpen the inquiry into the elusive factual question of intentional discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. at 255 n.8, 101 S. Ct. at 1094 n. 8.

Tennessee courts regularly employ the *McDonnell Douglas* approach in discrimination cases. *See, e.g., Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d at 708; *Spann v. Abraham*, 36 S.W.3d at 465. Under this approach, the employee has the initial burden of presenting evidence establishing

---

[7]*Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 724 (8th Cir. 2001) (holding that direct evidence is evidence of conduct or statements by persons involved in making the employment decision directly manifesting a discriminatory attitude).

[8]The United States Supreme Court characterized its *McDonnell Douglas* opinion as establishing "an allocation of the burden of production and an order for the presentation of proof." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S. Ct. 2742, 2746 (1993).

a prima facie case of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 2106 (2000); *Smith v. Bridgestone/Firestone, Inc.*, 2 S.W.3d 197, 200 (Tenn. Ct. App. 1999). This is an evidentiary standard, not a pleading requirement. *Swierkiewicz v. Sorema*, 534 U.S. 506, 510-11, 122 S. Ct. 992, 997 (2002).

Establishing a prima facie case of discrimination creates a rebuttable presumption that the employer unlawfully discriminated against the employee. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at 506, 113 S. Ct. at 2747; *Gonzalez v. El Dia, Inc.*, 304 F.3d 63, 68-69 (1st Cir. 2002). The effect of the presumption is to place on the employer the burden of producing evidence that the challenged employment action was taken for legitimate, non-discriminatory reasons. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. at 254, 101 S. Ct. at 1094; *Moore v. Nashville Elec. Power Bd.*, 72 S.W.3d at 652. This burden is one of production, not persuasion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. at 142, 120 S. Ct. at 2106. It requires the employer to clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999).

If the employer succeeds in carrying its burden of production, the presumption of discrimination drops out of the picture, and the trier of fact proceeds to decide the ultimate question of whether the employee has proved that the employer unlawfully discriminated against him or her. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. at 142, 120 S. Ct. at 2106; *St. Mary's Honor Ctr. v. Hicks*, 509 U. S. at 510-11, 113 S. Ct. at 2749. At this stage, the employee must have a full and fair opportunity to demonstrate that the employer's proffered reasons are pretextual and that unlawful discrimination was the true reason for the challenged employment action. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. at 256, 101 S. Ct. at 1095; *Versa v. Policy Studies, Inc.*, 45 S.W.3d 575, 580 (Tenn. Ct. App. 2000).

An employee may demonstrate that an employer's proffered, non-discriminatory reasons for an adverse employment action are pretextual by revealing the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002). Three of the most common ways to undermine an employer's proffered reasons include: (1) establishing that the proffered reasons have no basis in fact, (2) establishing that the proffered reasons did not actually motivate the adverse employment action, or (3) establishing that the proffered reasons were insufficient to motivate the adverse employment action. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000); *Cliff v. Board of Sch. Comm'rs*, 42 F.3d 403, 412 (7th 1994); *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993); *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d at 708. Proof that an employer's explanation is unworthy of credence is a persuasive way to prove unlawful discrimination. As Justice O'Connor has pointed out:

> In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. . . . [O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the

> best position to put forth the actual reason for its decision. . . . Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. at 147-48, 120 S. Ct. at 2108-09.

**B.**
**Prima Facie Discrimination Claims Under the *McDonnell Douglas* Framework**

The precise requirements of a prima facie case of unlawful discrimination can vary depending on the context. They were "never intended to be rigid, mechanized, or ritualistic." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943, 2949 (1978). Thus, the elements of a prima facie case using the direct method of proof may differ from the elements of a prima facie case using the indirect method. *Swierkiewicz v. Sorema*, 534 U.S. at 511-12, 122 S. Ct. at 997; *McDonnell Douglas*. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S. Ct. 613, 621-22 (1985) (holding that the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination).

**Prima Facie Age Discrimination Claims**

The Tennessee Human Rights Act prohibits employers from discriminating against their employees who are forty years old or older because of their age. Tenn. Code Ann. § 4-21-101(a)(3), (b). The Act's goal is to require employers to evaluate the performance of their older employees on their real, demonstrable merits rather than on the stereotypes often associated with aging. *Western Air Lines, Inc. v. Criswell*, 472 U.S. 400, 423, 105 S. Ct. 2743, 2756 (1985). Accordingly, Tenn. Code Ann. § 4-21-401(a)(1), (2) specifically prohibits age discrimination in hiring, firing, fixing compensation, or defining the terms and conditions of employment.

An employee seeking to recover for unlawful age discrimination must prove that considerations of age not only played a role in but determinatively influenced the employer's decision. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 U.S. 1701, 1706 (1993); *Loeffler v. Kjellgren*, 884 S.W.2d 463, 469 (Tenn. Ct. App. 1994); *Bruce v. Western Auto Supply Co.*, 669 S.W.2d 95, 97 (Tenn. Ct. App. 1984). To establish a prima facie case of age discrimination using the indirect method of proof, an employee who has been terminated must demonstrate (1) that he or she is a member of the protected class of persons forty years of age or older, (2) that his or her work performance satisfied the employer's reasonable expectations, (3) that he or she was actually or constructively terminated, and (4) that the termination occurred under circumstances giving rise to an inference of discrimination based on age. *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002). The fourth element of a prima facie age discrimination claim may be satisfied by presenting proof that the employee was replaced by someone substantially younger. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311-12, 116 S. Ct. 1307, 1310 (1996) (holding that an inference of discrimination cannot be drawn from the replacement of one worker with another worker insignificantly younger); *Dugan v. Albemarle County Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002); *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998); *see also Moore v. Nashville Elec.*

*Power Bd.*, 72 S.W.3d at 651-52 (holding that a prima facie case of age discrimination requires proof that an employee was replaced by a "younger person").

## Prima Facie Gender Discrimination Claims

The Tennessee Human Rights Act also prohibits employers from discriminating against their employees because of their gender. Tenn. Code Ann. § 4-21-101(a)(3); *Roberson v. University of Tenn.*, 829 S.W.2d 149, 150 (Tenn. Ct. App. 1992). Its purpose is to prohibit all gender discrimination in the workplace no matter whether the discrimination disadvantages women or men. *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682, 103 S. Ct. 2622, 2630 (1983). The Act specifically outlaws gender discrimination in hiring, firing, setting wages and benefits, and other conditions of employment. Tenn. Code Ann. § 4-21-401(a)(1), (2).

An employee seeking to recover for unlawful gender discrimination must present evidence directly showing or raising a reasonable inference that his or her employer's actions were based in a determinative way on considerations of the employee's gender. *Price Waterhouse v. Hopkins*, 490 U.S. at 241-42, 109 S. Ct. at 1786; *Turgeon v. Premark, Int'l, Inc.*, 87 F.3d 218, 221 (7th Cir. 1996). To establish a prima facie case of gender discrimination using the indirect method of proof, an employee who has been terminated must present evidence (1) that he or she belongs to a protected class, (2) that he or she was performing at a level that met the employer's reasonable expectations, (3) that he or she was actually or constructively terminated, and (4) that the termination occurred under circumstances giving rise to an inference of unlawful gender discrimination. *Lim v. Trustees of Ind. Univ.*, 297 F.3d 575, 580 (7th Cir. 2002); *Karpel v. Inova Health Sys. Serv.*, 134 F.3d 1222, 1228 (4th Cir. 1998); *Shumway v. United Parcel Serv.*, 118 F.3d 60, 63 (2d Cir. 1997); *Johnson v. Baptist Med. Ctr.*, 97 F.3d 1070, 1072 (8th Cir. 1996).

## IV.
### MR. WILSON'S PROOF OF EMPLOYMENT DISCRIMINATION

Mr. Wilson does not insist on this appeal that he established a prima facie case of either gender or age discrimination using the direct method of proof. Accordingly, our task is limited to determining whether he presented sufficient evidence to establish a prima facie case of gender and age discrimination using the indirect method of proof and whether he presented evidence that would permit the trier of fact to conclude that Sony/ATV's reasons for terminating him were pretextual. We answer both questions in the affirmative.

### A.
### Mr. Wilson's Prima Facie Case

The parties do not dispute that Mr. Wilson presented evidence that he belonged to a protected class of employees and that his performance was consistent with his employer's reasonable expectations. However, Sony/ATV asserts that Mr. Wilson failed to establish a prima facie case of either age or gender discrimination because he failed to present proof that he had been subjected to an adverse employment action and that he had been replaced as Vice President of Creative Services.

-10-

After considering the evidence in the light most favorable to Mr. Wilson, we have determined that he has established a prima facie case of both gender and age discrimination.

Sony/ATV's first argument that Mr. Wilson failed to demonstrate that he was subjected to an adverse employment action is premised on its insistence that Mr. Wilson resigned from his job. Notwithstanding Ms. Hilley's belief that Mr. Wilson had resigned during their August 13, 1996 meeting, Mr. Wilson has staunchly denied that he resigned during this meeting or at any other time. In his words, Sony/ATV "turned on me like a pack of dogs." He insists that he rejected Sony/ATV's severance package and that he continued to come to work following the August 13, 1996 meeting until Mr. Cook finally ordered him to clean out his desk and leave the building.

Mr. Wilson's version of the events surrounding the August 13, 1996 meeting is corroborated by Ms. McKeehan's testimony regarding the parties' contemporaneous statements.[9] In her August 3, 1998 affidavit, Ms. McKeehan states that, as he left Mr. Cook's office, Mr. Wilson told her that "I just got fired. I can't believe it, after twenty years." She also recounted that Mr. Cook later told her "Dan has been let go" and that Ms. Hilley likewise told her that Mr. Wilson "has gotten fired." For summary judgment purposes, Mr. Wilson's actions immediately following the August 13, 1996 meeting and the parties' characterizations of what had occurred at the meeting provide an adequate basis for concluding that Sony/ATV terminated Mr. Wilson and, therefore, that he had been subjected to an adverse employment action.

Sony/ATV's second argument is that Mr. Wilson has failed to establish a prima facie case of gender or age discrimination because he has failed to demonstrate that he was terminated under circumstances that give rise to an inference of unlawful gender or age discrimination. Specifically, Sony/ATV asserts that Mr. Wilson's prima facie case fails because he did not produce evidence that it hired another Vice President for Creative Services to replace him. We attach far less legal significance to Mr. Wilson's official title than does Sony/ATV.

Mr. Wilson's testimony regarding his duties and his job title is essentially undisputed. He stated that he had always been a song plugger and that the title of Vice President for Creative Services was simply an honorific bestowed on him because of his long tenure with Sony/ATV. He also stated that the title carried no additional compensation and did not change his duties as a song plugger. It is likewise undisputed that Sony/ATV hired a female song plugger twenty years Mr. Wilson's junior immediately after Mr. Wilson's departure. In light of these circumstances, it is immaterial that Sony/ATV did not bestow the title of Vice President for Creative Services on Mr. Wilson's replacement. A song plugger by any other name remains a song plugger. Accordingly, we find that Mr. Wilson presented evidence that Sony/ATV had replaced him with a substantially younger woman and that this circumstance was sufficient to establish a prima facie case of gender and age discrimination.

---

[9]Sony/ATV takes vigorous issue with Ms. McKeehan's credibility and with some cause. However, it is not our prerogative at this stage of the proceeding to determine what weight, if any, should be given to Ms. McKeehan's testimony. At this juncture, we need only determine whether Ms. McKeehan's testimony regarding the statements made to her by Ms. Hilley and Messrs. Wilson and Cook regarding Mr. Wilson's termination are admissible. We have determined that they are.

**B.**
**Mr. Wilson's Proof That Sony/ATV's Reasons for Terminating Him Were Pretextual**

Under the *McDonell Douglas* framework, Mr. Wilson's prima facie case gave rise to a rebuttable presumption that Sony/ATV terminated him because of his gender and age. Accordingly, the burden shifted to Sony/ATV to produce evidence that its decision to terminate Mr. Wilson was made for legitimate, non-discriminatory reasons. Sony/ATV successfully carried this burden by presenting evidence that it terminated Mr. Wilson because its Nashville executives believed that he had sexually harassed Ms. Gabell.

Sony/ATV's evidence regarding its innocent, nondiscriminatory reasons for terminating Mr. Wilson assumed pivotal importance at this stage of the proceeding. Not only did it dispel the presumption that Sony/ATV had engaged in unlawful gender and age discrimination, but it also shifted the burden of production back to Mr. Wilson to demonstrate that Sony/ATV's proffered reasons for terminating him were pretextual and that unlawful discrimination was the true reason for terminating him. At this stage of the proceeding, had Mr. Wilson been unable to produce or point to some evidence that Sony/ATV's proffered reasons were pretextual, Sony/ATV would have been entitled to a summary judgment dismissing Mr. Wilson's discrimination claims because the evidence regarding its legitimate, non-discriminatory reasons for terminating Mr. Wilson would have been undisputed. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at 507-08, 113 S. Ct. at 2747; *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1196 (10th Cir. 2002); *Moore v. Nashville Elec. Power Bd.*, 72 S.W.3d at 652.

We have concluded that the evidence in the current record, viewed in the light most favorable to Mr. Wilson, could provide the trier of fact with a factual basis for concluding that the innocent reasons articulated by Sony/ATV for terminating Mr. Wilson were pretextual. The evidence supporting this conclusion falls into three categories – the comments of Ms. Hilley and Mr. Cook regarding Mr. Wilson shortly before he was terminated, Sony/ATV's investigation of Ms. Gabell's harassment allegations, and Sony/ATV's apparent laxity in enforcing its sexual harassment policies with regard to other employees.

We turn first to the comments of Ms. Hilley and Mr. Cook in June and July 1996 before Mr. Wilson's termination. Mr. Wilson testified that Ms. Hilley made no secret of her desire to employ a female song plugger. According to Ms. McKeehan, both Ms. Hilley and Mr. Cook told her that Sony/ATV needed "new blood" and "younger people on the job." In addition, Ms. McKeehan stated that Ms. Hilley told her that she would have an opportunity to take Mr. Wilson's song plugger's job if he left and that Ms. Hilley made repeated derogatory comments regarding a man of Mr. Wilson's age dating a young woman like Ms. Gabell.

The comments attributed to Ms. Hilley and Mr. Cook would not suffice as direct evidence of discriminatory intent using the direct method of proof because they do not relate directly to Mr. Wilson's termination. Expressions of a desire to employ a female song plugger or to have "younger people on the job" do not necessarily reflect a settled intent to terminate an older male employee to make room for a younger female employee. Even the reference to needing "new blood" is

ambiguous.[10]  While the term frequently connotes the replacement of older workers with younger ones, it also connotes replacing existing employees with new ones. *Fortier v. Ameritech Mobile Communications, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998). Thus, while a reference to needing "new blood" standing alone does not raise an inference of age discrimination, *Beatty v. Wood*, 204 F.3d 713, 716-17 (7th Cir. 2000), it can, when viewed in the context of other statements, support an inference of discriminatory intent. *Buckley v. Hospital Corp. of Am., Inc.*, 758 F.2d 1525, 1530 (11th Cir. 1985).

These comments, however, provide a framework for considering Ms. Hilley's and Mr. Cook's actions after receiving Ms. Gabell's complaint about Mr. Wilson. To the extent that they reflect a settled intent to replace Mr. Wilson with a younger woman, the comments provide some insight into why Ms. Hilley and Mr. Cook might have decided against thoroughly investigating the truth of Ms. Gabell's complaint. As long as Ms. Gabell's allegations of sexual harassment remained unrebutted, they provided Sony/ATV with a facially appropriate reason to terminate Mr. Wilson.

Mr. Wilson also argues that Sony/ATV's failure to investigate the truth of Ms. Gabell's sexual harassment allegations provides additional support for concluding that the company's reliance on Ms. Gabell's claims was pretextual. While Ms. Hilley and Mr. Cook insist that they conducted an appropriate inquiry into Ms. Gabell's allegations, a reasonable trier of fact could conclude to the contrary. While it is undisputed that Sony/ATV officials heard both Ms. Gabell's and Mr. Wilson's accounts of their relationship, there is little indication that they were concerned about who was telling the truth.[11] After Mr. Wilson produced Ms. Gabell's love notes, calendar marked with hearts, and the cancelled checks to corroborate his version of his relationship with Ms. Gabell, no Sony/ATV official required Ms. Gabell to respond or to corroborate her allegations against Mr. Wilson.

Sony/ATV's sexual harassment policy required the company to "thoroughly and promptly investigate all claims of harassment." After reviewing the evidence regarding Sony/ATV's investigation of Ms. Gabell's allegations in the light most favorable to Mr. Wilson, we have concluded that a trier of fact could conclude that Sony/ATV did not conduct a thorough investigation into the truth of Ms. Gabell's allegations because it was not interested in determining whether Mr. Wilson had actually harassed Ms. Gabell. A trier of fact could conclude that Sony/ATV viewed Ms. Gabell's complaint as a convenient pretext for terminating him in order to hire a significantly younger woman.

Finally, Mr. Wilson argues that he presented evidence demonstrating that Sony/ATV's professed concern about sexual harassment in its workplace was not genuine and that he was terminated for conduct far less serious than other employees' conduct that was apparently condoned

---

[10] Despite Judge Posner's prediction, the expression "new blood" has apparently not disappeared from the employer's lexicon despite the increasing prevalence of age discrimination litigation. *Karlen v. City Colleges of Chicago*, 837 F.2d 314, 316 (7th Cir. 1988).

[11] When asked about the importance of determining who was telling the truth, Mr. Cook blithely responded "Well, you know, that wasn't my call."

by Sony/ATV. This evidence is found in Ms. McKeehon's August 3, 1998 affidavit which sets out a veritable parade of sexual harassment horribles occurring at Sony/ATV both before and after Mr. Wilson's termination. The affidavit also alludes to a systematic cover-up orchestrated by Sony/ATV's management during the discovery phase of this case.

Not surprisingly, Sony/ATV has launched a furious attack on Ms. McKeehon's affidavit. It asserts that Ms. McKeehon did not have personal knowledge of many of the facts recounted in her affidavit, that many of the events Ms. McKeehon describes in her affidavit are not relevant to Mr. Wilson's discrimination claims, and that Ms. McKeehon's testimony should be disregarded because she conceded that she did not respond truthfully to all the questions posed to her in an earlier deposition. We find these arguments unpersuasive at the summary judgment stage. There is little question that Ms. McKeehon has personal knowledge of most of the conduct described in her affidavit because she witnessed it. Her affidavit is relevant because it provides corroboration for Mr. Wilson's claim that Sony/ATV's concern about sexual harassment was pretextual. Finally, Ms. McKeehan's credibility goes to the weight, not the admissibility, of her testimony.

After reviewing the record in the light most favorable to Mr. Wilson, we have concluded that he has created a triable issue on the question of pretext. Sony/ATV asserts that he forfeited his job because he violated its policy against sexual harassment. Mr. Wilson's evidence tends to show that Sony/ATV was not genuinely concerned about sexual harassment of female employees and that Sony/ATV did not seriously investigate Ms. Gabell's harassment claim. On this evidence a reasonable trier of fact could disbelieve the company's proffered reason for terminating Mr. Wilson's employment and could believe that he was pushed out specifically to make his position available for a younger female. Accordingly, the trial court erred by granting Sony/ATV's motion for summary judgment.

## V.

We vacate the order granting the summary judgment and remand the case to the trial court for further proceedings consistent with this opinion. We tax the costs of this appeal to Sony/ATV Music Publishing, LLC for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

-14-