IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 5, 2024 Session

## YVONNE BERTRAND v. CARLEX GLASS AMERICA, LLC

**Appeal from the Chancery Court for Davidson County**
**No. 21-0317-II      Anne C. Martin, Chancellor**

_____

### No. M2023-00963-COA-R3-CV

_____

An employee discharged in a reduction-in-force claimed her employer discriminated against her. The trial court determined that the employee was unable to establish a prima facie case of discrimination and granted summary judgment to the employer. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY D. BENNETT and JEFFREY USMAN, JJ., joined.

Lorraine Wade, Smyrna, Tennessee, for the appellant, Yvonne Bertrand.

Howard B. Jackson, Knoxville, Tennessee, for the appellee, Carlex Glass America, LLC.

## OPINION

### I.

In 1997, Yvonne Bertrand began working at a glass manufacturing plant in Nashville, Tennessee, owned and operated by Ford Motor Company. After a series of ownership changes, Carlex Glass America, LLC came to operate the plant. During her tenure at the plant, Ms. Bertrand held several positions with Carlex, eventually becoming a manager of supply chain management compliance.

Approximately one year after assuming that role, Carlex implemented a reduction-in-force in response to the COVID-19 pandemic. As part of the reduction-in-force, Carlex required Ms. Bertrand's supervisor to reduce supply chain department expenses. Her

supervisor recommended eliminating two specific positions, one of which was Ms. Bertrand's. Carlex accepted the recommendations.

Under Carlex's severance program, employees with more than 15 years of service, like Ms. Bertrand, received offers of one week of pay for each year of service up to a maximum of 26 weeks. Carlex included years of service with predecessor owners of the glass plant in the calculation.[1]

Dissatisfied with the offer, Ms. Bertrand asked Carlex's human resources manager to reconsider it "from an equitable perspective." She had "received favorable evaluations" up through her most recent one in 2018. And she "was never disciplined." She had done "a lot of firsts with that company." In her eyes, it would be inappropriate to "accept anything less than two years' salary" as severance "purely based on an equitable position." But Carlex "declined to increase its severance offer to her in order to be consistent with the program's terms."

Following the denial of her request for more severance, Ms. Bertrand sued Carlex for race and sex discrimination under the Tennessee Human Rights Act. *See* Tenn. Code Ann. §§ 4-21-101 through -1004 (2021 & Supp. 2024). According to Ms. Bertrand, an African American woman, Carlex had treated her differently than similarly situated white, male employees during the reduction-in-force. The white, male manager in the supply chain department was not terminated. And Ms. Bertrand had reason to believe that another white, male employee had negotiated greater severance pay than he had initially been offered.

Carlex claimed that it determined which positions would be eliminated in the reduction-in-force "for legitimate business reasons." It did not have a written policy or formula for those decisions. The 44 terminated employees included several African American and white employees as well as both female and male employees. Still, Ms. Bertrand was concerned to discover an email between two human resources employees in which one informed the other that it was "ok to let it slip" to Ms. Bertrand that her white, male supervisor was also terminated because "[t]he optics look better then for [the department]."

At the deposition of Carlex's corporate representative, the representative testified that the company "felt that others in the department had some skill sets that [Ms. Bertrand] didn't have." They included "being able to negotiate with suppliers and developing positive working relationships with suppliers, problem solving skills others had in terms of

---

[1] Due to an administrative error, Carlex sent four employees letters stating that they would receive *two* weeks of severance pay for each year of service up to the 26-week maximum. Ms. Bertrand was one of those four employees. Because Carlex chose to honor the letters despite the error, it offered Ms. Bertrand the maximum 26 weeks of severance pay.

dealing with supplies and supplier issues, and understanding when it was necessary to actually go and see and visit the supplier to address issues of concern." Ms. Bertrand's annual performance evaluations up through 2018 did not reflect issues in these areas. But after the deposition—which took place years after Ms. Bertrand was terminated—Carlex produced a document it alleged to be Ms. Bertrand's 2019 evaluation. According to that document, Ms. Bertrand's supervisor had determined she was not meeting expectations in all areas of her work.

Ms. Bertrand's supervisor explained that he decided which positions to eliminate based on "the needs of the Supply Chain department" and his "own observations of performance." In choosing which managerial role to eliminate, he had compared the two positions that "involved quality assurance and product compliance work." And he "decided that it would be better to retain" the other manager over Ms. Bertrand because that manager "had greater ability to manage supplier relationships and develop relationships with them," "did a better job of working through issues with suppliers in the field," "was generally a better problem solver," and "was generally better in working together with others." The supervisor explained that he reached these conclusions solely through his own observations, without consulting any others.

Ms. Bertrand contended that her supervisor's proffered rationale was mere pretext for discriminatorily including her in the reduction-in-force. And she considered the "magically appear[ing]" 2019 evaluation "to be fabricated." The supervisor had never informed her of any issue with her performance nor discussed a 2019 evaluation with her. In fact, Ms. Bertrand testified that she and the supervisor had worked well together and that he treated her well. But she suggested that there "was a culture that existed" at Carlex in which white males were "always the leadership." So she concluded that her supervisor "chose to eliminate her" based on her race and gender.

As for the severance package, Ms. Bertrand complained that Carlex had reconsidered its initial offer to a white, male employee while it had not negotiated with her. That employee was originally offered severance pay commensurate with the company's record of him completing 14 years of service. But he pointed out that he had initially begun working at the glass plant in the 1970s and remained there for decades before retiring for less than a year and then returning. Because of the gap in service, he "was not grandfathered in," as Ms. Bertrand had been, when Carlex acquired the plant. But upon his request, Carlex agreed to modify his offer to include the maximum 26 weeks of severance pay. Carlex determined that "it was fair and reasonable to credit him for his previous service" with predecessor owners of the plant, especially because Carlex did the same for others and because "his break in service was short."

In Ms. Bertrand's view, the company had lied to her by telling her that "others ha[d] asked for exceptions and none were given." And the other employee had been given "more weeks [of severance pay] than he was entitled." Ms. Bertrand explained that she "kn[e]w

3

how [the termination process] works" based on a previous experience in which she had proposed a severance package for a single employee who was terminated. She felt that, in this situation, because "everything is confidential . . . the company c[ould] decide and agree to honor [an employee's] requests."

Carlex asserted that it "did not offer nor pay" more than 26 weeks of severance "to any employee whose position was eliminated in that reduction-in-force." Ms. Bertrand testified that she, too, was unaware of anyone receiving more than 26 weeks of severance pay. But she was dissatisfied with the company's approach, which she faulted as being inconsistent. She explained that different employees had different experiences, so "just because you got [a certain number of weeks of severance pay] doesn't mean I should get it or just because I got it doesn't mean you should get it." In her view, Carlex's decision to maintain its initial offer of 26 weeks of severance pay was a form of discrimination because it was "an effort to discount the integrity of [her] request" for two years of pay. And "it was an effort to continue to demean the efforts of African Americans and to discount any efforts that we put forth anything to advance." She applied the same logic to her sex discrimination claim.

Carlex moved for summary judgment, which the trial court granted. The court concluded that Ms. Bertrand failed to present necessary evidence "to show that she was 'singled out' for impermissible reasons." Thus, she could not establish a prima facie case of employment discrimination. Even if the court assumed that Ms. Bertrand had made out a prima facie case, "she ha[d] not presented sufficient evidence to create a genuine issue of fact for trial that [Carlex's] stated reason for her elimination was pretextual." Nor had she presented evidence to "overcome [Carlex's] nondiscriminatory reason that it declined to offer [her] more than the program maximum so that the company could be consistent in administration of that policy." So the trial court dismissed Ms. Bertrand's claims.

## II.

On appeal, Ms. Bertrand contends that the trial court erred in granting summary judgment to Carlex on her race discrimination claims. She does not pursue her sex discrimination claims.

Summary judgment may be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." TENN. R. CIV. P. 56.04. The party moving for summary judgment has "the burden of persuading the court that no genuine and material factual issues exist and that it is, therefore, entitled to judgment as a matter of law." *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993). When the party moving for summary judgment does not have the burden of proof at trial, that party must submit evidence either "affirmatively negating an essential element of the nonmoving party's claim" or "demonstrating that the

4

nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim." *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 264 (Tenn. 2015). Carlex contended, and the trial court agreed, that Ms. Bertrand's evidence was insufficient to establish her claims of race and sex discrimination.

A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008); *Blair v. W. Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004). The decision presents a question of law. *Martin*, 271 S.W.3d at 84; *Blair*, 130 S.W.3d at 763. So we must review the record de novo and make a fresh determination of whether the requirements of Tennessee Rule of Civil Procedure 56 have been met. *Eadie v. Complete Co.*, 142 S.W.3d 288, 291 (Tenn. 2004); *Blair*, 130 S.W.3d at 763. Like the trial court, in reviewing the record, we "take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." *Byrd*, 847 S.W.2d at 210-11.

## A.

Ms. Bertrand first claims that the trial court erred in granting Carlex summary judgment on her termination claim under the Tennessee Human Rights Act. The THRA "is a comprehensive anti-discrimination statute." *Goree v. United Parcel Serv., Inc.*, 490 S.W.3d 413, 426 (Tenn. Ct. App. 2015) (citing *Phillips v. Interstate Hotels Corp. No. L07,* 974 S.W.2d 680, 683 (Tenn. 1998)). Its purpose is to "[p]rovide for execution within Tennessee of the policies embodied in" federal civil rights laws. Tenn. Code Ann. § 4-21-101(a)(1) (2021). Thus, Tennessee courts regularly look to federal case law for guidance in interpreting claims brought under the THRA. *Wilson v. Rubin*, 104 S.W.3d 39, 48 (Tenn. Ct. App. 2002); *see also Parker v. Warren Cnty. Util. Dist.*, 2 S.W.3d 170, 172-73 (Tenn. 1999).

The THRA prohibits employers from discharging an employee based on the employee's race. Tenn. Code Ann. § 4-21-401(a)(1) (2021). To maintain a private right of action under the THRA, a plaintiff employee has the initial "burden of establishing a prima facie case of intentional discrimination or retaliation." *Id.* § 4-21-311(e) (2021). Satisfying that burden in an unlawful employment discrimination case requires the plaintiff employee to show that "(1) she is a member of a protected class; (2) she was qualified for the job; (3) she suffered an adverse employment action; and (4) she was treated differently than similarly situated employees outside of her protected class." *Hawthorne v. Univ. of Tenn. Health Sci. Ctr.*, 203 F. Supp. 3d 886, 891 (E.D. Tenn. 2016); *see also White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). Where a discrimination claim is based on a reduction-in-force, courts modify the fourth element to require a showing of "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990).

5

Here, Ms. Bertrand and Carlex did not dispute that the first three elements necessary to establish a prima facie case were satisfied. Thus, the focus on summary judgment was whether, making all reasonable inferences in Ms. Bertrand's favor, the evidence she produced was sufficient to establish the fourth element. Rather than relying on direct or statistical evidence tending to indicate she was singled out for discharge based on race, Ms. Bertrand relied on circumstantial evidence.[2] *See id.*; *see also Spann v. Abraham*, 36 S.W.3d 452, 464-65 (Tenn. Ct. App. 1999) (describing the distinction between direct and circumstantial evidence).

Ms. Bertrand's evidence boils down to a few facts. She was the only African American manager in supply chain management and the only manager terminated. A white, male manager in the same department was retained. Carlex late-produced a negative 2019 performance evaluation of her, which she claimed was fabricated. Disregarding that evaluation, her performance evaluations were all positive. She also relies on the "optics" email between the two human resources employees referencing the dismissal of Ms. Bertrand's supervisor and the fact that Carlex lacked a written policy for reduction-in-force decisions.

We conclude that this evidence, even taken together, does not tend to indicate that Carlex singled out Ms. Bertrand for discharge based on her race. Certainly, "[t]he mere termination of a competent employee when an employer is making cutbacks due to economic necessity is insufficient to establish a prima facie case of . . . [impermissible] discrimination." *LaGrant v. Gulf & W. Mfg. Co.*, 748 F.2d 1087, 1090 (6th Cir. 1984). "When an employer is forced to reduce its staff for economic reasons, the most common legitimate reason for the discharge is the [reduction-in-force] itself." *Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 896 (6th Cir. 1997) (citing *Barnes,* 896 F.2d at 1465). With a reduction-in-force, "qualified employees are going to be discharged." *Id.* (citing *Barnes,* 896 F.2d at 1466). So the decision to terminate an African American manager, even one who garnered only positive performance evaluations, while retaining a white manager does not establish a prima facie case of race discrimination. Ms. Bertrand offered no proof of the retained manager's performance evaluations. So she cannot contend she received better evaluations.

The email upon which Mr. Bertrand relies does not alter our conclusion. As noted above, in the email, a member of Carlex's human resources department suggested that Carlex let "slip" that Ms. Bertrand's white supervisor had also been terminated. The sender suggested that information made for better "optics." Assessing the relevancy of such a statement, however, requires consideration of the identity of the speaker and the substance of the statement. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355 (6th Cir. 1998). A discriminatory statement by a person "who may have influenced" an adverse employment decision may be probative. *Id.* But statements "by non-decision makers" or

---

[2] Counsel for Ms. Bertrand conceded this point at oral argument.

statements "unrelated to the decisional process itself" are generally not probative. *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004) (quoting *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998)); *Wilson*, 104 S.W.3d at 49 (explaining that comments "by persons who are not part of the decision-making process will not suffice").

The email is not probative of discriminatory intent. Ms. Bertrand admits that the human resources employee who sent the email "was not involved in the decision" to terminate her position "at all." Nor does she argue that he had any influence over the decision-makers; in her words, he was merely "informed of the decision" by Carlex's president. And he sent the email after Ms. Bertrand's termination, "when Carlex was aware of her dissatisfaction with her severance payment."

Ms. Bertrand suggests that the email and the late-produced 2019 performance evaluation undermine Carlex's justification for her dismissal. Even were that a reasonable inference, as noted by the trial court, whether the reduction-in-force was a pretext only becomes an issue after Ms. Bertrand establishes a prima facie case of impermissible discrimination. *See* Tenn. Code Ann. § 4-21-311(e). We also agree with the trial court that the lack of a written policy or formula to implement the reduction-in-force does not support her claim of race discrimination.

Because Ms. Bertrand could not point to circumstantial evidence tending to indicate that Carlex singled her out for discharge for impermissible reasons, she could not establish a prima facie case of race discrimination. So we need not reach the question of whether Carlex can offer a legitimate, nondiscriminatory reason for its actions or whether Ms. Bertrand can rebut the proffered reason as being mere pretext for discrimination. *See Frye v. St. Thomas Health Servs.*, 227 S.W.3d 595, 611 (Tenn. Ct. App. 2007); *see also Quinn v. Shelby Cnty. Sch.*, No. W2022-00104-COA-R3-CV, 2023 WL 2729674, at *11 (Tenn. Ct. App. Mar. 31, 2023).

B.

Ms. Bertrand next argues that the court erred in granting Carlex summary judgment regarding her severance benefit claim. The THRA also prohibits employers from discriminating "against an individual with respect to compensation . . . because of such individual's race." Tenn. Code Ann. § 4-21-401(a)(1). Again, our focus is on the fourth element of a prima facie case of employment discrimination: whether Ms. Bertrand was treated differently than similarly situated employees outside her protected class. *See Hawthorne*, 203 F. Supp. 3d at 891.

A plaintiff who seeks to rely on a similarly situated employee to establish a claim of race discrimination must show that the employees' situations "were similar in all relevant respects." *Goree*, 490 S.W.3d at 450 (quoting *Pierce v. City of Humboldt*, No.

W2012-00217-COA-R3-CV, 2013 WL 1190823, at *11 (Tenn. Ct. App. Mar. 25, 2013)); *Ercegovich*, 154 F.3d at 353. Employees may be "similarly situated" when they have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *Bundy v. First Tenn. Bank Nat. Ass'n*, 266 S.W.3d 410, 419 (Tenn. Ct. App. 2007).

Ms. Bertrand argues that she was similarly situated to a white employee whose severance offer was reconsidered, while hers was not. The evidence shows that this employee asked Carlex to recalculate his severance offer to include his years of service before a short break in his employment at the glass plant. Carlex agreed to do so and raised his severance pay to the maximum 26 weeks of pay under its reduction-in-force program.

Unlike the white employee, Ms. Bertrand had already been offered the maximum 26 weeks of severance pay under the program. She requested two years of salary instead, though she knew of no other employee who had received more than 26 weeks. She made an appeal to "equity" rather than a claim that her years of service should be calculated differently.

Here, a comparable non-protected person was not treated better. *See Mitchell*, 964 F.2d at 582-83 (paraphrasing the disparate treatment standard). Ms. Bertrand's complaint is that she was treated the same as others. Her request for severance pay was significantly above what any other employee received and beyond the program maximum. To the extent Ms. Bertrand and the employee whose severance was reconsidered were "similarly-situated," we conclude that Ms. Bertrand failed to show that she was treated differently.

Because Ms. Bertrand has not provided evidence of Carlex's favorable treatment of a similarly situated employee outside the protected class, summary judgment on her severance benefit discrimination claim was also appropriate.

## III.

We conclude that Ms. Bertrand failed to establish a prima facie case of unlawful employment discrimination or disparate treatment. So we affirm the grant of summary judgment.

_s/ W. Neal McBrayer_____
W. NEAL MCBRAYER, JUDGE