IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 1, 2020 Session

## TERRY WALLACE v. CITY OF LEWISBURG, TENNESSEE

**Appeal from the Circuit Court for Marshall County**
**No. 11-CV-80      Franklin L. Russell, Judge**

_____

### No. M2019-01690-COA-R3-CV

_____

Former city employee brought suit for age discrimination under the Tennessee Human Rights Act. Based upon its determination that the city fired the employee because a majority of the city council members disapproved of his job performance and that the employee failed to prove that age was a determining factor in his termination, the trial court dismissed the employee's complaint. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

Roger Steven Waldron, Murfreesboro, Tennessee, for the appellant, Terry Wallace.

Stephen W. Elliott and Fetlework S. Balite-Panelo, Nashville, Tennessee, for the appellee, City of Lewisburg, Tennessee.

### OPINION

FACTUAL AND PROCEDURAL BACKGROUND

Terry Wallace, who was born in 1947, acted as the director of Marshall County's emergency medical service from 1972 until he was elected county executive in 1990. Mr. Wallace served in that role for four terms,[1] but he lost the election in 2006.

As county executive, Mr. Wallace had a voting position on the industrial board for the City of Lewisburg. The county gave $20,000.00 to the city to have a voice in industrial recruiting. Mr. Wallace worked closely with the city's industrial recruiter to help attract

_____

[1] During Mr. Wallace's tenure, the title of the position changed from "county executive" to "county mayor."

industry to the area and believed that he acquired skills in industrial recruiting by virtue of his position as county executive. Mr. Wallace "had connections with the State of Tennessee and with [the Tennessee Valley Authority]," as well as connections with local industrial leaders. In his work as county executive, Mr. Wallace participated in efforts to assist local industry, including in lieu of tax investments and industrial development bonds.

A few months after he lost the election in 2006, Mr. Wallace applied for the position of city economic development coordinator, or industrial recruiter, with the City of Lewisburg. The city council interviewed him and recommended to the city manager, Eddie Fuller, that he be hired. Mr. Fuller then hired Mr. Wallace for the position. At the time of the interview, the council asked Mr. Wallace about his computer skills, and he informed them that he "did not have any computer skills at this time, but I was taking . . . going to take a course at Columbia State, a non-accredited course in computers." The council and Mr. Fuller expressed satisfaction with this response. Mr. Fuller mentioned that Greg Lowe, a city codes inspector, had the necessary computer skills and could assist Mr. Wallace, if necessary.

Mr. Wallace began acting as Lewisburg's industrial recruiter in 2007. During his tenure and through his efforts, three businesses moved into the city's new industrial park. Mr. Wallace estimated that those companies brought 170 to 205 new jobs with them. He also assisted companies already doing business in Lewisburg to help them stay there. Although Mr. Fuller was Mr. Wallace's direct supervisor, they rarely discussed his job performance. Mr. Wallace attended monthly industrial board meetings and gave a report of his activities. At times, city council members would attend the industrial board meetings.

On July 31, 2009, Mr. Fuller called Mr. Wallace and Mr. Lowe into his office and asked them both to sign the following letter:

> Eddie informed Terry and Greg that it is public perception that Greg is doing Terry's job. Eddie informed them that they were to do their own job duties. The codes enforcement [Mr. Lowe's job] has been lacking and several complaints have been filed.
>
> They understood and will implement Eddie's recommendations immediately.

The signatures of Mr. Lowe, Mr. Wallace, and Mr. Fuller appear on the letter. According to Mr. Lowe, he stopped helping Mr. Wallace as frequently but continued to provide Mr. Wallace with computer support on large projects.

There was a city council election in 2009, and the composition of the council changed. In the summer of 2010, Mr. Wallace heard rumors that his continued employment

had been discussed at a budget meeting. He asked the new mayor, Barbara Woods, if a council member had said he could be replaced by someone right out of college for $30,000, and she acknowledged that this had occurred. She encouraged him to attend the next budget meeting.

In early July 2010, Mr. Fuller talked to Mr. Wallace and informed him that there were three council members (out of five) who wanted Mr. Wallace to resign. They felt that he was not doing his job. Mr. Fuller gave Mr. Wallace the option of resigning; otherwise, Mr. Fuller would terminate his employment. Mr. Wallace asked Mr. Fuller for a week to talk to the council members, and Mr. Fuller granted his request. While at a Fourth of July celebration, Mr. Wallace learned that a local radio station was broadcasting the story that he was about to be terminated by the city. Mr. Wallace was humiliated by the radio broadcast, which the station continued to air.

When Mr. Wallace refused to resign, Mr. Fuller terminated his employment. Mr. Lowe, age 41, was hired to fill the position in October 2010.

There is no dispute that, during the period when Mr. Wallace held the position of industrial recruiter, from 2007 through 2010, the economic outlook in Marshall County, and in the United States overall, was unfavorable. The testimony at trial established that, by 2009, when Mr. Wallace was terminated, the Great Recession had led to unemployment of around twenty percent in Marshall County, one of the hardest hit areas in Tennessee.

Mr. Wallace filed suit against the City of Lewisburg ("the City") in July 2011 asserting a claim for age discrimination pursuant to the Tennessee Human Rights Act.[2] The City answered denying liability and asserting affirmative defenses. Prior to the trial date, Mr. Wallace filed a motion in limine asking the trial court to "exclude from evidence any testimony of Plaintiff's alleged inadequate work performance." Mr. Wallace argued that Mr. Fuller's statement on a separation notice that Mr. Wallace was discharged "without cause" was conclusive. In an order entered on January 4, 2016, the trial court denied the motion in limine.

During the trial on April 25 to 27, 2016, the court heard testimony from numerous witnesses, including Mr. Wallace, Mr. Fuller, Mr. Lowe, Ms. Woods, three former members of the industrial development board ("IDB"), four former city council members, the executive director of the joint economic commission, the chairman of the parks and recreation board, a former employee of the city parks and recreation department, and an expert witness for Mr. Wallace. Overall, the IDB members expressed their approval for Mr. Wallace's job performance and their disappointment with his termination. Mr.

---

[2] The complaint also included a claim for violation of the Open Meetings Act; this claim was dismissed before trial pursuant to the City's unopposed motion for partial summary judgment.

Wallace kept the IDB informed about his work, and Mr. Fuller never discussed Mr. Wallace's termination with the IDB.

The testimony established that the City was having budget difficulties during the time period in question and that the parks and recreation department, in particular, was losing money. Mr. Fuller testified that he directed department heads to terminate the least productive employees. Asked to explain the reasons for Mr. Wallace's termination, Mr. Fuller stated that there were three council members who were dissatisfied with Mr. Wallace's job performance. Because Mr. Fuller served at the pleasure of the council, he felt that he had to be responsive to the wishes of the majority of the council members in order to retain his position. As will be discussed more fully below, the four former council members testified concerning their problems with Mr. Wallace's job performance, although one stated that he would not have voted in favor of termination.

After hearing all of the evidence, the trial court entered a memorandum opinion detailing its findings and analysis. The court concluded:

> The first three elements of an age discrimination claim are clearly present in this case. However, age discrimination has not been proven to have been a determining factor in the termination. An isolated statement by a Council member about hiring a recent college graduate (which did not occur) and stress on other City employees due to budget issues do not establish that age was a determining factor in the termination of Mr. Wallace. The evidence suggests that the termination resulted from pressure by three City Council members on the City Manager, and the evidence suggests that the pressure was motivated by personal or political hostility to Mr. Wallace and by a need to find a scapegoat for economic sluggishness in the Marshall County economics during a period of national economic malaise. The termination was handled unprofessionally but not in a manner that was actionable. The Complaint will be dismissed.

Accordingly, the trial court entered an order, on November 27, 2017, dismissing Mr. Wallace's complaint.

On April 16, 2018, Mr. Wallace filed a Rule 60 motion for relief from the judgment on the ground that his attorney did not receive the order of dismissal and that, because the order did not comply with Tenn. R. Civ. P. 58, it was not a final order. The trial court determined that the order substantially complied with Rule 58 and was a final order. Mr. Wallace appealed, and this court determined that the order of dismissal did not comply with Rule 58 and, therefore, was not a final order. On remand, the trial court clerk attached a certificate of service, dated August 21, 2019, to the November 2017 order of dismissal. It is from this final order that Mr. Wallace now appeals.

Mr. Wallace presents the following issues on appeal: (1) whether the trial court erred in denying his motion in limine to exclude evidence of his alleged inadequate work performance; (2) whether Mr. Fuller's testimony concerning his reasons for terminating Mr. Wallace was contradictory and the asserted reasons should "cancel each other out"; (3) whether this court should reverse the trial court's ruling that Mr. Wallace's age was not the but-for cause of his termination; and (4) whether this case should be remanded for a ruling on damages, attorney fees, Mr. Wallace's reinstatement, and the assessment of court costs and discretionary expenses.

ANALYSIS

I.      Motion in limine.

Mr. Wallace asserts that the trial court erred in denying his motion in limine to exclude evidence of his alleged inadequate work performance. We review a trial court's ruling on the admissibility of evidence, including a decision on a motion in limine, under an abuse of discretion standard. *Singh v. Larry Fowler Trucking, Inc.*, 390 S.W.3d 280, 284 (Tenn. Ct. App. 2012). A trial court abuses its discretion when it "causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski,* 350 S.W.3d 99, 105 (Tenn. 2011).

A motion in limine affords parties a means of "requesting guidance from the trial court prior to trial regarding an evidentiary question which the court may provide, at its discretion, to aid the parties in formulating their trial strategy." *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 192 (Tenn. Ct. App. 2008). Such a motion should not be used as a substitute for a dispositive motion. *Jackson v. Joyner*, 309 S.W.3d 910, 915 (Tenn. Ct. App. 2009); *Duran*, 271 S.W.3d at 192; *see also Dunn ex rel. Albery v. State Farm Mut. Auto Ins. Co.*, 264 F.R.D. 266, 274-75 (E.D. Mich. 2009). Rather, a motion in limine properly addresses "'discrete evidentiary issues related to trial,'" *Dunn*, 264 F.R.D. at 274 (quoting *Nomo Agroindustrial SA DECV v. Enza Zaden N. Am. Inc.*, No. CV-05-351-TUC-FRZ, 2007 WL 1077023, at *1 (D. Ariz. Apr. 9, 2007)), and is essentially a substitute for an evidentiary objection at trial. *Jackson*, 309 S.W.3d at 915. Thus, a trial court should avoid "[o]rders in limine which exclude broad categories of evidence." *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975).

Mr. Wallace asserted in his motion in limine that all evidence of his alleged inadequate work performance should be excluded on the grounds that Mr. Fuller's statement in the separation notice that Mr. Wallace's termination was "without cause" was conclusive. In the context of an employment discrimination case, the reasons for an employee's termination constitute a material issue to be proven at trial. *See Wilson v. Rubin*, 104 S.W.3d 39, 49 (Tenn. Ct. App. 2002). Granting Mr. Wallace's motion would have hampered or prevented the City from mounting a defense to his age discrimination

claim by excluding a broad category of relevant evidence. *See Duran*, 271 S.W.3d at 193 (stating motion in limine should not be used to "'choke off' a party's entire case or defense").

Mr. Wallace relies upon *Hensley v. Cocke Farmers Cooperative*, No. E2014-00264-SC-R3-WC, 2015 WL 1929874 (Tenn. Workers' Comp. Panel Apr. 27, 2015), to support his argument that the reason stated in the separation notice should be deemed conclusive. In *Hensley*, the workers' compensation panel affirmed the trial court's determination that the minutes of the employer's board meeting "were conclusive evidence of the reason for Employee's termination" and that parol evidence in the form of testimony from members of the board stating contrary reasons did not create a genuine issue of material fact to preclude partial summary judgment. *Hensley*, 2015 WL 1929874, at *4. The employer in *Hensley* was a Tennessee nonprofit corporation and, pursuant to Tenn. Code Ann. § 48-58-101(b), all corporate powers were exercised by the board, which speaks through its minutes. *Id.*

The circumstances of the present case are distinguishable from *Hensley* because Mr. Wallace is relying upon the statement of Mr. Fuller, the city manager, in a separation notice. Unlike the corporation's minutes in *Hensley*, the separation notice did not represent the official action or deliberations of the City. The City of Lewisburg is governed by a city council, which exercises the powers of the City. *See* Charter of the City of Lewisburg ("Charter"), art. III, §§ 1, 8, 1915 TENN. PRIV. ACTS ch. 214, as amended by 1961 TENN. PRIV. ACTS ch. 36, as amended. The city council has the authority to appoint a city manager, who "shall be the administrative head of the municipal government under the direction and supervision of the City Council." Charter, art. VII, § 1. Thus, a statement by Mr. Fuller does not constitute an official, conclusive action of the City.

We find no abuse of discretion in the trial court's denial of Mr. Wallace's motion in limine.

II.     Cancellation rule.

Mr. Wallace next asserts that the trial court erred in failing to disregard Mr. Fuller's testimony pursuant to the cancellation rule. He specifically argues that the cancellation rule should apply with respect to Mr. Fuller's testimony regarding (a) whether there was any cause for Mr. Wallace's termination, (b) whether Mr. Wallace's lack of computer skills was a factor in his termination, and (c) whether the July 31, 2009 document constitutes a written warning or documentation of a verbal warning.

The cancellation rule provides that "contradictory statements by the same witness regarding a single fact cancel each other out." *Church v. Perales*, 39 S.W.3d 149, 169 (Tenn. Ct. App. 2000); *see also Taylor v. Nashville Banner Publ'g Co.*, 573 S.W.2d 476, 482 (Tenn. Ct. App. 1978). As our Supreme Court has explained, "[t]he statements only

cancel each other out, however, if the contradiction is unexplained and 'neither statement can be corroborated by other competent evidence.'" *TWB Architects, Inc. v. Braxton, LLC*, 578 S.W.3d 879, 895 (Tenn. 2019) (quoting *Church*, 39 S.W.3d at 170). We must determine "'whether there is an explanation for the inconsistency and whether either version is corroborated by other evidence.'" *Id.* (quoting 1 Neil P. Cohen et al., TENNESSEE LAW OF EVIDENCE § 6.07[5] (6th ed. Supp. 2017)).

(a) Any cause for Wallace's termination.

Mr. Wallace argues that Mr. Fuller's testimony that he wrote "without cause" on the separation notice used for purposes of unemployment benefits is inconsistent with his testimony on the cause of Mr. Wallace's termination by the City. Therefore, he avers that the testimony should be subject to the cancellation rule. As discussed below, Mr. Fuller's testimony includes an explanation of his "without cause" statement, and his testimony of the causes of Mr. Wallace's termination is corroborated by competent evidence.

Mr. Fuller testified that he wrote "without cause" on Mr. Wallace's separation notice so that Mr. Wallace would be able to receive unemployment benefits. He viewed the "without cause" notation as equivalent to a statement that the City would not object to Mr. Wallace receiving unemployment benefits. Mr. Fuller understood his actions to be consistent with City practice "that we didn't contest terminated individuals receiving unemployment benefits" except in rare cases. Mayor Woods corroborated Mr. Fuller's testimony on using the "without cause" phrase on the separation notice. She testified:

> I had—having read the things that I had read, I understood that that was— you did not give a reason. The City hired people to work for them, they didn't have to give a reason to dismiss them, and that that was generally what you would write to dismiss someone.

Mr. Wallace testified that he received unemployment benefits after his termination by the City.

In light of the explanatory testimony regarding the City's policy on separation notices, Mr. Fuller's statement on the separation notice is not inconsistent with his testimony regarding the reasons for Mr. Wallace's termination.

(b) Lack of computer skills as a factor.

Mr. Wallace points to several different statements made by Mr. Fuller on the issue of whether Mr. Wallace's lack of computer skills played a role in his termination. He argues that the testimony is contradictory and should cancel itself out.

During the trial, Mr. Fuller testified that Mr. Wallace's lack of computer skills was an issue with his job performance, but not a "major" one:

Q. Computer skills had nothing to do with Terry Wallace's employment, did it?

A. Being able to use the computer?

Q. Yes, sir.

A. A little bit. I mean, he—in the beginning, we told him he needed to, you know, learn PowerPoint presentations and stuff like that. I think he failed to do that.

Q. But is that why he got fired?

A. I mean, that's not a specific reason, no.

Q. Was his—were his computer skills an issue with his job performance?

A. Was it an issue?

Q. Yes, sir.

A. Him not being able to do the PowerPoint presentations was somewhat of an issue, but nothing major.

Mr. Fuller was then questioned about his deposition testimony, in which he had stated that Mr. Wallace's lack of computer skills was not an issue with his job performance. In response, Mr. Fuller testified: "I took this question [in his deposition] that he was fired because he couldn't operate a computer. And the answer would be no."

When asked why Mr. Wallace was terminated, Mr. Fuller stated that he was terminated in part because a majority of the city council members were not satisfied with him. As to other reasons, Mr. Fuller stated: "I mean, I considered—I could see him being a little lax in his job. And there was really actually nothing coming in, you could say . . . ." Mr. Fuller also testified that, if the council had been happy with Mr. Wallace, he would have been employed with the City until Mr. Fuller retired.

The testimony of other witnesses corroborates the testimony of Mr. Fuller that Mr. Wallace's lack of computer skills was a part of the reason for the overall dissatisfaction with his job performance. Mayor Woods testified that council members were unhappy about Mr. Wallace's "general failure to perform the job like they wanted it performed, and he did not learn to use the computer as they had asked him—as he had been asked to do when he was hired." Council member Brandon-Stewart, in particular, raised concerns about Mr. Wallace's inability to use email and lack of computer skills, noting that, more than once, she saw Mr. Lowe giving presentations for industrial recruitment.

In light of Mr. Fuller's explanation for his deposition testimony and the corroborating testimony in support of his trial testimony, the cancellation rule does not apply to this portion of Mr. Fuller's testimony.

(c) Significance of July 31, 2009 document.

Mr. Wallace argues that Mr. Fuller gave inconsistent testimony concerning the July 31, 2009 letter informing Mr. Wallace and Mr. Lowe of the public perception that Mr. Lowe was doing Mr. Wallace's job and instructing them to do their own jobs. To support this position, he points to Mr. Fuller's trial testimony that he did not know whether to call this a written warning and his deposition testimony that the letter constituted a verbal warning. Mr. Fuller further stated that the letter was not intended as a verbal reprimand but as documentation that they had talked about the problem. Nevertheless, the consistent import of Mr. Fuller's testimony is that the letter was intended as a warning to Mr. Wallace and Mr. Lowe of the public perception and the need to adhere to their own job responsibilities.

Mr. Lowe's testimony corroborates Mr. Fuller's testimony:

Eddie [Fuller] called us in saying that it sort of was perceived that Terry [Wallace] wasn't doing his job and/or I was doing much of his job and that we should really stop doing it. And so we—you know, we explained how we were doing things, that I was just assisting doing that. Eddie had us sign this and suggested we kind of do our own jobs.

Mr. Wallace himself gave similar testimony, agreeing that this letter represented "the closest thing to a disciplinary action" he experienced while employed by the City.

We find no substantive inconsistency here because the testimony shows that the letter constituted a warning.[3] Therefore, the cancellation rule does not apply.

III.    Age discrimination claim.

Mr. Wallace argues that the trial court erred in concluding that he failed to establish that age was a determining factor in the City's decision to terminate his employment. With a bench trial, our review is de novo upon the record, accompanied by a presumption of correctness of the trial court's findings of fact, unless the preponderance of the evidence is otherwise. TENN. R. APP. P. 13(d); *Gregg v. Estate of Cupit*, No. M2018-00379-COA-R3-CV, 2018 WL 5733289, at *3 (Tenn. Ct. App. Oct. 31, 2018); *Nashville Ford Tractor, Inc. v. Great Am. Ins. Co.*, 194 S.W.3d 415, 424-25 (Tenn. Ct. App. 2005). We afford the trial court's credibility determinations great deference because the trial court is able to assess

---

[3] Mr. Wallace makes a distinction between a written warning and documentation of a verbal warning because he complains that the City failed to follow its own disciplinary procedures. There is no real dispute, however, that the City did not follow the hierarchy of disciplinary procedures recommended for employees with unsatisfactory work performance. As the trial court noted, "the absence of formal discipline does not circumstantially prove or even promote the proposition that Mr. Wallace was a victim of age discrimination."

the witnesses' demeanor as they testify. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). We review the trial court's legal conclusions de novo with no presumption of correctness. *Nashville Ford Tractor*, 194 S.W.3d at 425.

Mr. Wallace claims that the City terminated his employment in violation of the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. §§ 4-21-101–4-21-607, which prohibits employers from discriminating against employees forty years of age or older because of their age. Tenn. Code Ann. § 4-21-101(a)(3), (b). The THRA seeks to further the policies embodied in similar federal discrimination statutes and, thus, Tennessee courts have historically consulted federal caselaw for guidance in interpreting the THRA. *Yount v. FedEx Express*, No. W2015-00389-COA-R3-CV, 2016 WL 1056958, at *4 (Tenn. Ct. App. Mar. 17, 2016); *Wilson*, 104 S.W.3d at 48. To recover for unlawful age discrimination under the THRA, an employee bears the burden of proving "that considerations of age not only played a role in but determinatively influenced the employer's decision." *Williams v. Greater Chattanooga Pub. Television Corp.*, 349 S.W.3d 501, 509 (Tenn. Ct. App. 2011).

Although it is possible to prove age discrimination by direct evidence, most plaintiffs must rely upon the indirect method of proof. *Goree v. United Parcel Serv., Inc.*, 490 S.W.3d 413, 426-27 (Tenn. Ct. App. 2015). Cases interpreting the THRA have held that, to make out a prima facie case of age discrimination, a plaintiff must satisfy the criteria set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Brenner v. Textron Aerostructures*, 874 S.W.2d 579, 583-84 (Tenn. Ct. App. 1993). Under the *McDonnell Douglas* framework, a plaintiff must prove that: "(1) he was a member of the protected class; (2) he was subjected to adverse employment action; (3) he was qualified for the position; and (4) he was replaced by a younger person." *Id.* at 584.

The trial court found that Mr. Wallace met his burden of proof to establish a prima facie case of age discrimination.[4] The proof supports the trial court's determination that Mr. Wallace met the criteria of the prima facie analysis: he was over the age of 40, he was terminated from his job, he was qualified for the position,[5] and the person who was later hired to fill his position, Mr. Lowe, was 41 years old when hired (a younger person). The trial court then stated that Mr. Wallace had not proven that age was a determining factor in his termination, which is the ultimate issue in an age discrimination case. *See Bruce v. W. Auto Supply Co.*, 669 S.W.2d 95, 99-100 (Tenn. Ct. App. 1984).

---

[4] The trial court referenced the Tennessee Pattern Jury Instruction, which presents the elements of the prima facie case in the first three of four requirements for age discrimination. *See* 8 TENN. PRAC. PATTERN JURY INSTR. T.P.I.-CIVIL 11.55 (2020 ed.)

[5] Consideration of the City's allegations regarding inadequate performance (used as part of its defense) is not appropriate at the prima facie stage of the *McDonnell Douglas* framework. *See Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 587-88 (6th Cir. 2002).

Once the employee has established a prima facie case of age discrimination, there is a rebuttable presumption of unlawful discrimination. *Wilson*, 104 S.W.3d at 50. This presumption places "on the employer the burden of producing evidence that the challenged employment action was taken for legitimate, non-discriminatory reasons." *Id.* If the employer meets its burden of production, "the presumption of discrimination drops out of the picture, and the trier of fact proceeds to decide the ultimate question of whether the employee has proved that the employer unlawfully discriminated against him or her." *Id.* At this stage of the analysis, the employee seeks to demonstrate that the reasons given by the employer are pretextual and that the true reason for the challenged action was unlawful discrimination. *Id.*; *Goree*, 490 S.W.3d at 427.

The City asserts that Mr. Wallace "was terminated because a majority of the Council members were dissatisfied by Wallace's inability to bring new industries at a time when the City's sluggish economy desperately needed new industries to ease the City's unemployment problem." Mr. Wallace argues that the trial court failed to find that the City "had produced evidence of a legitimate reason for the challenged employment action." We respectfully disagree. The trial court found that the "without cause" statement in the separation notice was "false" and rejected defense witnesses' assertions of poor job performance, but the court made the following determination: "The evidence suggests instead that the real reason for the termination was subjective disapproval by three of the Council members and a need to find a scapegoat for economic sluggishness not related in any way to Wallace's job performance."

Because the City produced evidence to show a non-discriminatory reason for Mr. Wallace's termination, the presumption of discrimination drops away. *See Wilson*, 104 S.W.3d at 50. The central issue on appeal is whether the trial court erred in failing to find that age was a determining factor in the City's decision to terminate Mr. Wallace's employment.[6] Part of Mr. Wallace's burden at this stage was to prove that the City's proffered reason for his termination was pretextual. *See id.* To demonstrate that the employer's proffered reasons are pretextual, an employee may reveal the "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's explanation." *Id.* at 51 (quoting *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217

---

[6] Mr. Wallace cites federal cases, most notably *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009), applying a but-for standard to age discrimination cases brought under the federal Age Discrimination in Employment Act. In Tennessee, "an employee asserting a claim under the THRA [traditionally] bore the burden of showing that his age was 'a determining factor' in the adverse employment decision.'" *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 n.2 (6th Cir. 2014) (quoting *Flynn v. Shoney's, Inc.*, 850 S.W.2d 458, 460 (Tenn. Ct. App. 1992)). The Sixth Circuit has noted: "It is by no means certain that the Tennessee Supreme Court would choose to adopt the *Gross* standard; in other contexts, Tennessee courts have chosen to deviate from heightened federal causation standards for claims brought under the THRA." *Id.* (citing *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 29 (Tenn. 2011)). Mr. Wallace has not explicitly raised the issue of the appropriate causation standard in this appeal, and we decline to address that issue.

(10th Cir. 2002)).  Some common means of undermining an employer's reasons are the following:

> (1) establishing that the proffered reasons have no basis in fact, (2) establishing that the proffered reasons did not actually motivate the adverse employment action, or (3) establishing that the proffered reasons were insufficient to motivate the adverse employment action.

*Id.*

Mr. Wallace relies upon *Davis v. Reliance Electric*, 104 S.W.3d 57 (Tenn. Ct. App. 2002), for the proposition that "'disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination,'" and that "'rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination.'"  *Davis*, 104 S.W.3d at 62 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993)).  The court in *Davis* was interpreting an arbitrator's award and, in that context, determined that the arbitrator "followed the proper framework" when deciding the discrimination claim.  *Id.* at 58, 63.  The rule cited by Mr. Wallace can apply only when the court does not believe the reasons proffered by the employer.  *Id.* at 62.  Rejection of the pretext does not require, but only permits, a finding of intentional discrimination.  *Id.*  Moreover, the ultimate burden of proof remains on the employee at all times.  *Id.* (citing *Hicks*, 509 U.S. at 511).

Mr. Wallace argues that the reason given by the City was not actually the reason for Mr. Fuller's decision to terminate him.  He acknowledges that he was targeted by three of the five city council members, but asserts that the "targeting as described by Fuller is more suggestive of an intent to discriminate when the statement of false reasons for termination is considered along with the mendacity surrounding the announcement to the community by radio of [Mr. Wallace's] termination."[7]  Although the apparent leak of information to the radio station was understandably upsetting to Mr. Wallace, it does not tend to prove intent on the part of the City to discriminate against him on the basis of age.  Rather, as stated by the trial court, "this is not evidence of age discrimination but rather is strong evidence of personal or political hostility."

One piece of evidence emphasized by Mr. Wallace is the alleged statement of Council member Quinn Brandon-Stewart at a budget workshop in July 2010 that the City could replace Mr. Wallace with a recent college graduate at a fraction of his salary.  To

---

[7] The evidence did not establish how the radio station learned that the City was about to terminate Mr. Wallace's employment.

bolster his argument here, Mr. Wallace relies upon a "cat's paw" theory of employer liability derived from federal caselaw:

> In employment discrimination law the "cat's paw" metaphor refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action. So if for example the subordinate has told the supervisor that the employee in question is a thief, but as the subordinate well knows she is not, the fact that the supervisor has no reason to doubt the truthfulness of the accusation, and having no doubt fires her, does not exonerate the employer if the subordinate's motive was discriminatory.

*Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012). Mr. Wallace asserts that Ms. Brandon-Stewart's statement shows discriminatory intent and that she manipulated Mr. Fuller to bring about Mr. Wallace's unlawful termination.

Ms. Brandon-Stewart's deposition was admitted into evidence. When asked about the June 2010 budget workshop, Ms. Brandon-Stewart did not recall any discussion about the possibility of replacing Mr. Wallace with someone out of college at a lower salary. She also did not recall having a discussion with Mr. Fuller about Mr. Wallace's job performance prior to his termination. She thought that Mr. Fuller was concerned that the county had "the highest unemployment rate in the state." Ms. Brandon-Stewart said that she encouraged Mr. Fuller in his decision to terminate Mr. Wallace because many people complained to her about the high unemployment rate, about Mr. Wallace not being in the office, and about Mr. Lowe, rather than Mr. Wallace, giving industrial recruitment presentations. She testified that, on more than one occasion, she had been to IDB meetings at which Mr. Lowe had given presentations. According to Ms. Brandon-Stewart, some members of the IDB were concerned about Mr. Wallace's job performance.

Mr. Fuller testified that he interpreted Ms. Brandon-Stewart's statement as a suggestion about how to save money: "[W]e were at a budget workshop meeting and we were talking about the city budget, the numbers, you know. And I think she made the statement, considering we could save [$]20- or $30,000." The trial court found that Mr. Wallace's actual replacement was "not newly graduated from college and not paid a fraction of Wallace's salary."

Three of the five city council members recommended Mr. Wallace's termination— Ms. Brandon-Stewart, Odie Whitehead, and Ronald McRady. Explaining the reasons behind his recommendation, Mr. Whitehead stated that, during the time that Mr. Wallace was the industrial recruiter, many jobs were leaving Marshall County and there were no new jobs coming in. Mr. Whitehead's constituents were concerned about the loss of jobs

- 13 -

and how to maintain their standard of living. He assessed Mr. Wallace's job performance as "stagnant or nill." Mr. Whitehead believed that Mr. Wallace could have been more active and assertive in his efforts to bring jobs into the area. He denied that age was a factor in Mr. Wallace's termination and testified that, while he was on the city council, the City hired age-protected persons for other positions.

Mr. McRady testified that, during the time period in question, the unemployment rate in Marshall County was 18 to 20 percent, and the city council was concerned that "we weren't getting any industry in here." Mr. Wallace was the industrial recruiter who was trying to bring industry to the county. When asked whether Mr. Wallace's age was a factor in his termination, Mr. McRady commented that Mr. Wallace "seemed to be a pretty young fellow" to him.[8] He testified that he had not heard anyone else on the city council say that Mr. Wallace's age was problematic. Mr. McRady denied instructing Mr. Fuller to fire Mr. Wallace.[9]

Another council member, Clarence Minor, testified that he did not participate in the council discussions about Mr. Wallace's job performance because he considered Mr. Wallace a friend. If Mr. Wallace had not been his friend, Mr. Minor stated, he probably would have talked to Mr. Fuller about Mr. Wallace's job performance. Mr. Minor was displeased that Mr. Wallace was on vacation when the City made an important presentation for the Tennessee Valley Authority and others had to take over in his place. He was not aware that age was a factor in any of the council members' unhappiness with Mr. Wallace.

In analyzing the significance of Ms. Brandon-Stewart's statement, the trial court discussed *Brenner v. Textron Aerostructures*, 874 S.W.2d at 585, a case in which a plaintiff based his age discrimination claim on the statement by the company president that one objective of the human resources department was to "establish and maintain a recruitment program that brings in new, young talent to ensure a base of future key contributors of new ideas of technology." The plaintiff in that case also presented statistical evidence to support his age discrimination claim. *Brenner*, 874 S.W.2d at 585. The trial court in this case summarized the *Brenner* court's analysis:

> The *Brenner* court quotes the following statement from *Gagné v. Northwestern National Insurance*, 881 F.2d 309, 314 (6th Cir. 1989): "Case precedent clearly reflects that isolated and ambiguous statements . . . are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination.'" *Gagné* at 314. In *Gagné*, the employee plaintiff's supervisor had said to the plaintiff that he, the supervisor, "needed new

---

[8] Mr. McRady was born in 1936. Mr. Whitehead was born in 1946.

[9] Mayor Woods testified that Mr. McRady was one of the council members who was unhappy with Mr. Wallace's job performance.

blood." The employee plaintiff in *Brenner* tried to distinguish *Gagné* by asserting that the statement made in *Gagné* "was made facetiously." *Brenner* at 586. The *Brenner* court observed that the statement made in *Gagné* was "isolated, made only once" and "was not directed at any particular individual." *Id.*

The *Brenner* court then examined the court's earlier holding in *Flynn v. Shoney's Inc.*, [850 S.W.2d 458, 460 (Tenn. Ct. App. 1992], as follows:

> In *Flynn v. Shoney's, Inc.* we found that remarks made by the plaintiff's superior were sufficient to take the case to the jury on the issue of age discrimination. *Flynn v. Shoney's Inc.*, 850 S.W.2d 458, 460 (Tenn. App. 1992). The plaintiff's superior in *Flynn* made the following statements: "that after restructuring it was 'out with the old and in with the new;' that for the same money Mr. Flynn was paid the company could hire a lot of 'eager young bucks right out of college;' and that it was a 'young man's business.'" *Id.* at 459. These statements were directed to the plaintiff and are much less susceptible of different interpretations. Moreover, we held that "*repeated* references to the employee's age by the company representative while informing the employee of his termination is some evidence from which the jury could infer that age was a factor." *Id.* at 460 (emphasis added). Hence, only one statement was made, and it was made five years before plaintiff was terminated. Plaintiff has not demonstrated the causal connection between the statement and his termination, as did the plaintiff in *Flynn.*
>
> Plaintiff insists that even though the statement was made only once, it became the policy of the Human Resources Department. Plaintiff asserts that because the president of the company made the statement, the management of the Human Resources Department automatically adopted it. Plaintiff testified that it is common human resources practice for every subordinate to adopt his manager's objectives. However, even if we take this allegation as true, there is no evidence in the record that the "policy" adversely affected plaintiff or any other employee within the protected class. *Id.*

The *Brenner* court concluded, "Although this court has previously held that statements by an employee can establish evidence of age discrimination, in this [*Brenner*] case, we find the president's statement to be insufficient as a

matter of law." *Id.* This holding was made in spite of the fact that in *Brenner* there were statistics . . . to support the employee's claim and in spite of the fact that the Court of Appeals was reviewing a grant of summary judgment and not reviewing a dismissal after a full trial.

Looking at the facts before it, the trial court concluded that Ms. Brandon-Stewart's statement was "isolated and ambiguous . . . and too abstract" to support Mr. Wallace's claim. *See Brenner*, 874 S.W.2d at 585-86 (quoting *Gagné*, 881 F.2d at 314). The trial court noted that Ms. Brandon-Stewart was "only one of three Council members pursuing the termination behind the scene," that her remark "was isolated from the pressure by the Council to terminate Mr. Wallace," and that there was no evidence that "the 'policy' adversely affected plaintiff or any other employee within the protected class." *See id.* at 586. With the exception of Ms. Brandon-Stewart, the trial court was able to view the witnesses and assess their credibility. The evidence does not preponderate against the trial court's decision not to infer discriminatory intent on the part of the City from Ms. Brandon-Stewart's isolated statement.

Mr. Wallace also argues that there is circumstantial evidence of age discrimination in this case. He points to the testimony of Jane Tilford, former assistant director of the parks and recreation department for the City, who testified:

Q. Okay. What led to your retirement?
A. Oh, okay. Well, there were several factors. One was it had gotten to be a pretty stressful job. The economy was bad. There were lots of cuts within the budget. It seemed like we were on the hot seat all the time. And I just felt that—I felt that there was some amount of, I felt, not necessarily pressure, but I could feel—it was becoming stressful. And I decided that I wanted to retire before I was pushed out. I really just didn't think I could survive if I was pushed out. So that's why I left.
Q. Why were you concerned about being pushed out?
A. Well, I knew there was—the—it seemed like every week we had some sort of meeting where the council was needing us to cut our budget more. We had lots of meetings about that. And it seemed like the payroll was – well, it didn't seem like the payroll was an issue; the payroll was an issue. So just began to feel that often the best place to cut is from the top. And I was the second highest paid employee at the parks and rec department, so I felt that there was some pressure.

Ms. Tilford further stated that she felt that she and Guy Chambers, the department director, "were kind of getting under the gun." She stated that her replacement was Michelle Harrison; she estimated Ms. Harrison to be in her late 30s or early 40s when she was hired.

- 16 -

When asked if she knew Harold Wiggins, Ms. Tilford stated that he was employed by the parks and recreation department for "probably 20 or more years." She thought that Mr. Wiggins retired the year before she did; he was in his late 70s at that time. Ms. Tilford recalled that Councilman McRady asked her one day if Mr. Wiggins had retired yet, and she informed him that Mr. Wiggins had not retired. Mr. McRady said "that these other employees were gone, that he was going to proceed with that information." According to Ms. Tilford, Mr. Wiggins retired the following day. After Mr. Wiggins retired, his position was abolished; the responsibilities were "covered by a variety of part-time people or one of us."

Ms. Tilford further testified that, before her retirement, she asked Mr. Fuller if she could be "pushed out" if she announced a retirement date. Mr. Fuller "said that he had spoken to a lawyer . . . about that at some point, and he assured me that if I announce my date, I should be okay." Ms. Tilford understood Mr. Fuller's statement to mean that he had asked an attorney on his own behalf.

We agree with the trial court's finding that "[t]he thrust of Ms. Tilford's testimony, however, was not that she was discriminated against because of her age but rather that she was extremely stressed by the fact that the City was under great financial pressure and that there was a constant threat to close the Recreation Center in order to save money." The testimony of other witnesses corroborates this interpretation. For example, Mayor Woods testified:

> Q. And around the same time period, Mayor Woods, are you aware that there was some discussion in the city council about how the rec center was performing – or maybe not performing – in regards to the City budget?
> A. Yes.
> Q. And what do you remember about that?
> A. That was a big topic. It was quite frequently argued that they were expending a lot of money there, that the force needed to be cut, that there were too many people working there and there were too many managers there. They needed to reduce some of the management so it was more functional on the City – more complementary to the City budget. It's always in the hole, but they wanted to reduce some of the larger workforce to help bring it back close into line.
> Q. Around that time period did some management with the rec center cease to become employed with the City?
> A. I think, by retirement, a couple of members left, who weren't replaced for that work reduction purpose.
> Q. Do you remember who those were?
> A. Guy Chambers and Jane Tilford. I wanted to say Jane Barns.
> Q. Were you aware of any pressure put on either Ms. Barns-Tilford or Mr. Chambers to retire?

A. Not that I was aware of.

Leslie Woodward, chair of the City parks and recreation board, testified that he overheard a conversation in which Mr. Whitehead said that the City was "going to have to get rid of some people because of the economy was bad, and the people who had the high salaries would be the ones to go." Mr. Woodward stated that, with respect to Mr. Chambers and Ms. Tilford, "the councilmen were wanting to get their salaries out of there because the economy was bad." He confirmed that the recreation center was a drain on the City's budget.

In sum, the circumstantial evidence upon which Mr. Wallace relies shows that the City was concerned that it could not afford the high salaries of the employees with the most seniority. The argument that "the desire to save money on salary costs is a proxy for age discrimination" has been rejected by courts, including the Sixth Circuit. *Hugo v. Millennium Labs., Inc.*, 993 F. Supp. 2d 812, 829 (E.D. Tenn. 2014). The Supreme Court explained the distinction in *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993):

> When the employer's decision *is* wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age . . . . On average, an older employee has had more years in the work force than a younger employee, and thus may well have accumulated more years of service with a particular employer. Yet an employee's age is analytically distinct from his years of service. An employee who is younger than 40, and therefore outside the class of older workers as defined by the ADEA, see 29 U.S.C. § 631(a), may have worked for a particular employer his entire career, while an older worker may have been newly hired. Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily "age based."

*Hazen Paper Co.* 507 U.S. at 611. To make out a claim for age discrimination, one must prove that the employer "discriminated against [the employees] because they were old, not because they were expensive." *Allen v. Diebold, Inc.*, 33 F.3d 674, 677 (6th Cir. 1994).

We conclude, as the trial court implicitly did, that Mr. Wallace failed to prove that the City's proffered reason for its termination of Mr. Wallace was pretextual. He further failed to prove that age was a determining factor in the City's decision to terminate his employment.

CONCLUSION

The judgment of the trial court is affirmed, and costs of this appeal are taxed against the appellant, Terry Wallace, for which execution may issue if necessary.

_____

ANDY D. BENNETT, JUDGE